UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

_____

|   |   |
|---|---|
| **WENDY B. ADELSON,** | ] |
|  | ] |
| Plaintiff, | ] |
|  | ] **CASE NO. 1:07-cv-13142** |
|  | ] **HON. TERRENCE G. BERG** |
| -vs- | ] **Mag. Mona K. Majzoub** |
|  | ] |
|  | ] |
| **OCWEN FINANCIAL CORPORATION,** | ] |
| **OCWEN LOAN SERVICING, LLC,** | ] |
| **HSBC BANK USA N.A.,** as Trustee on behalf of | ] |
| **ACE SECURITIES CORP. HOME EQUITY LOAN** | ] |
| **TRUST SERIES 2007-HE1,** | ] |
| *Asset Backed Pass-Through Certificates*, | ] |
| **MERSCORP, INC,** & **MORTGAGE ELECTRONIC** | ] |
| **REGISTRATION SYSTEMS,** | ] |
| **FEDERAL DEPOSIT INSURANCE CORPORATION** | ] |
| **SCOTT W. ANDERSON,** individually and in his | ] |
| Capacities as Senior Vice President of Ocwen Loan | ] |
| Servicing, LLS, Vice President of MERS, and | ] |
| Vice President of HSBC, jointly & severely | ] |
|  | ] |
| Defendants, | ] |

_____

# PLAINTIFF'S OPPOSITION OF
# DEFENDANT, SCOTT W. ANDERSON'S MOTION TO DISMISS


Plaintiff, Wendy B. Adelson, In Pro Per, respectfully requests that this Honorable Court deny Defendant, Scott W. Anderson's Motion for the reasons set forth in the accompanying Brief.


Respectfully submitted,

May 05, 2016

_/s Wendy Adelson_

Wendy Adelson, Pro Se,
Attorney for Plaintiff,

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

_____

| | |
|---|---|
| **WENDY B. ADELSON,** | ] |
| | ] |
| Plaintiff, | ] |
| | ]    **CASE NO. 1:07-cv-13142** |
| | ]    **HON. TERRENCE G. BERG** |
| -vs- | ]   **Mag. Mona K. Majzoub** |
| | ] |
| | ] |
| **OCWEN FINANCIAL CORPORATION,** | ] |
| **OCWEN LOAN SERVICING, LLC,** | ] |
| **HSBC BANK USA N.A.,** as Trustee on behalf of | ] |
| **ACE SECURITIES CORP. HOME EQUITY LOAN** | ] |
| **TRUST SERIES 2007-HE1,** | ] |
| *Asset Backed Pass-Through Certificates,* | ] |
| **MERSCORP, INC,** & **MORTGAGE ELECTRONIC** | ] |
| **REGISTRATION SYSTEMS,** | ] |
| **FEDERAL DEPOSIT INSURANCE CORPORATION** | ] |
| **SCOTT W. ANDERSON,** individually and in his | ] |
| Capacities as Senior Vice President of Ocwen Loan | ] |
| Servicing, LLS, Vice President of MERS, and | ] |
| Vice President of HSBC, jointly & severely | ] |
| | ] |
| Defendants, | ] |

_____

# <u>PLAINTIFF'S BRIEF IN SUPPORT OF HER OPPOSITION OF DEFENDANT, SCOTT W. ANDERSON'S MOTION TO DISMISS</u>

Respectfully submitted,

May 05, 2016                       _/s_ _Wendy Adelson_

Wendy Adelson, Pro Se,
Attorney for Plaintiff

## **TABLE OF CONTENTS**

STATEMENT OF COUNTER ISSUES PRESENTED…………………………………….........v

TABLE OF AUTHORITIES……………………………………………………………………..ii

INTRODUCTION, ................................................................................................................. 1

BACKGROUND, ................................................................................................................... 3

LOAN PERFORMANCE, ...................................................................................................... 6

THE WHY?, ........................................................................................................................... 8

ARGUMENTS, .................................................................................................................... 11

STANDARD OF REVIEW, ................................................................................................. 10

I.  JURISDICTION ATTACHES TO ANDERSON UNDER MICHIGAN'S "LONG ARM"
    STATUTE, ...................................................................................................................... 11

    A.  Exercise of Specific Jurisdiction, ............................................................................. 12

    B.  Exercise of Limited Jurisdiction, .............................................................................. 12

    C.  Exercise of General Personal Jurisdiction, ............................................................... 15

    D.  Purposeful Availment Arising From Scott Anderson's Activities, ........................... 18

    E.  Inference Of Reasonableness Due Process, .............................................................. 22

II. SCOTT ANDERSON UTILIZED HIS EMPLOYMENT WITH OCWEN, MERS, & HSBC
    TO PERPETRATE A FRAUD IN MICHIGAN, .............................................................. 26

    A.  Piercing the Corporate Veil in Michigan, ................................................................. 26

    B.  Piercing Delaware Limited Liability Company Veil, ................................................. 27

    C.  Piercing the Delaware Corporate Veil, ...................................................................... 28

    D.  Fed. R. Civ. P. Rule 9 (b), ........................................................................................ 31

    E.  Personal Liability, ..................................................................................................... 33

# TABLE OF AUTHORITIES

**Federal Cases**

Air Prods, 503 F.3d at 550 ................................................................................. 16

Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997 ............................. 31

Am. Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir.1988). ........................................... 27

Aristech Chem. Inter. Ltd. v. Acrylic Fabricators Ltd., 138 F.3d 624, 628 (6th Cir. 1998)......... 15

Balance Dynamics Corp. v Schitt Industries, Inc, 204 F. 3d 683, 698 (6th Cir. 2000). ............... 19

Ballan v. Upjohn Co., 814 F.Supp. 1375, 1385 (W.D.Mich.1992) ............................................ 34

Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000)............................................... 14

Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir.2000).............................................. 14

Coffey v. Foamex, 2 F.3d 157, 161–62 (6th Cir.1993) ............................................................. 34

CompuServe, Inc. v. Patterson, 89 F.3d 1257 (6th Cir. 1996),.................................................. 22

Elliot v. Caribbean Utilities, supra, 513 F.2d at 1179.............................................................. 19

Fieldcrest Mills, Inc. v. Mohasco Corp.,442 F.Supp. 424, 428 (M.D.N.C.1977). ...................... 20

Porta–John of America v. United States, 4 F.Supp.2d 688, 700 (E.D.Mich.1998) ..................... 28

International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Third Nat'l Bank v. WEDGE
    Group, Inc., 882 F.2d 1087, 1089 (6th Cir. 1989). .................................................. 14

Jeffreys v. Exten, 784 F.Supp. 146 (D.Del.1992).................................................................. 15

Kerry Steel, 106 F.3d at 150 ................................................................................................ 21

Lanier v Am. Board of Endocontics, 843 F2d 901 (6th Cir) .................................................... 17

Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 724 (6th Cir.1996). ................................. 13

McGee v. International Life Insurance Co., 355 U.S. 220, 78 S. Ct. 199, 2 L.Ed.2d 223 ........... 19

Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir.1988 .......................... 34

Miller Brewing Co. v. Acme Process Equipment Co., 441 F. Supp. 520 (E.D.Wis.1977) .......... 20

Neal v Janssen 270 F3d 328 (6th Cir. 2001 .......................................................................... 18

Neal v. Janssen, 270 F.3d 328, 332 (6th Cir. 2001);.............................................................. 15

Neogen Corp. v. Neo *818 Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir.2002)................... 13

Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 888 (6th Cir. 2002); ........................ 16

Neogen, 282 F.3d at 887 .................................................................................................... 14

Neogen, 282 F.3d at 888 .................................................................................................... 14

NetJets Aviation, Inc. v. LHC Comm'ns LLC, 537 F.3d 168, 177 (2d Cir. 2008)..................... 31

Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1115 (6th Cir. 1994) ......................... 14

Serras v. First Tenn. Bank National Association, 875 F.2d 1212, 1214 (6th Cir.1989)............... 14

Servo Kinetics, Inc. v. Tokyo Precision Instruments Co., 475 F.3d 783, 798 (6th Cir.2007)...... 28

Southern Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968 ....................... 15

Southern Machine Company v. Mohasco Industries, Inc., 401 F.2d 374, 381 (6th Cir.1968))..... 25

Theunissen, 935 F.2d at 1461 .............................................................................................. 27

Ticketmaster -- New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994) .............................. 27

United Advertising Agency, Inc. v. Robb, 391 F.Supp. 626, 630 (M.D.N.C.1975) ................... 20

United Electrical Workers I, 960 F.2d at 1089 ....................................................................... 26

Vespe Contracting Co. v. Anvan Corp., 433 F. Supp. 1226, 1232 (E.D.Pa.1977)...................... 19

Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir.1983)................................................ 13

<u>Michigan **State Cases**</u>

Allen v. Morris Building Company, [360 Mich. 214 (1960) ....................................................... 29
Citizen Bank v. Parnes, 2010 WL 1753296 (6th Cir. 2010) ...................................................... 23
Hempfling v. Burr, 59 Mich. 294, 295, 26 N.W. 496 (1886) .................................................... 29
Oberlies v. Searchmont Resort, Inc., 633 N.W.2d 408, 413 (Mich. Ct. App. 2001). ................. 16
Seasword v. Hilti, 449 Mich. 542, 537 N.W.2d 221, 224 (1995) .............................................. 28
Sifers v. Horen, 188 N.W.2d 623, 624 n.2 (Mich. 1971) ......................................................... 16
Wines v. Crosby & Co., [169 Mich. 210, 214 (1912) .............................................................. 29
Witbeck v Bill Cody's Ranch Inn, 428 Mich 659 (411 NW2d 439 (1987 ................................. 18
Zaino v. North Woodward Construction Company, [355 Mich. 425, 429 (1959) ...................... 29

<u>Michigan **State Statutes**</u>

MCL § 450.1217 ......................................................................................................................... 5
M.C.L. § 600.705 ...................................................................................................................... 15
M.C.L. § 600.735 ...................................................................................................................... 15
MCL 600.711, .......................................................................................................................... 18
MCL § 600.715(1) ..................................................................................................................... 16

**<u>Federal Rules</u>**

Rule 12(b)(2) ............................................................................................................................ 13
Rule 12(b)(6) ............................................................................................................................ 13
Rule 8(a), ................................................................................................................................. 34
Rule 36 (3)(6)(b) ..................................................................................................................... **29**
Rule 9 (b) ................................................................................................................................ **34**

**<u>Other Authorities</u>**

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1067, at 298 (2d
  ed.1987). ............................................................................................................................... 18

**<u>Other Case Authorities</u>**

Cf. AccuImage Diagnostics Corp. v. TeraRecon, Inc., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003)
  ............................................................................................................................................. 33
Brewer v. Monsanto Corp., 644 F.Supp. 1267, 1273 (M.D.Tenn.1986)) .................................. 34
Frances T. v. Village Green Owners Ass'n., 42 Cal.3d 490, 504 (1986) .................................... 32
Frances T., 42 Cal.3d at 505 ..................................................................................................... 32
James v. Marinship Corp. 25 Cal. 2d 721, 742–43 (1944). ....................................................... 32
Kilroy, 357 B.R. 411, 425 (Bankr. S.D. Texas 2006); .............................................................. 30
PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1380 (2d. Dist. 2000). ..................................... 32
PMC, Inc., 78 Cal. App. 4th at 1385 ........................................................................................ 33
SR International Business Insurance Co. v World Trade Center Properties, LLC, 375 F. Supp. 2d
  238, 243 (S.D.N.Y. 2005), ................................................................................................... 31
United States Liability Ins. Co. c. Haidinger-Hayes, Inc., 1 Cal. 3d 586, 595 (1970) ................ 32

**<u>U.S. Supreme Court</u>**

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1986)...........................................21
Calder v Jones, 465 U.S. 783 (1984) .............................................................................22
Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)....................13
Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L.Ed.2d 1283 (1958). ................19
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)........................21
Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984)......16
International Shoe Co. v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945). .........19
Keeton v. Hustler Magazine, Inc., 465 U. S. 770, 775 (1984)........................................26
Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)..........................................21
McGee v. International Life Insurance Co., 355 U.S. 220 (1957)....................................22
Milliken v. Meyer, 311 U. S. 457, 463 (1940)................................................................26
Shaffer v. Heitner, 433 U.S. 186, 97 S. Ct. 2569, 53 L.Ed.2d 683 (1977). ..................20
World–Wide Volkswagen v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490
    (1980))...................................................................................................................28

## Supreme Court

480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)...........................................28
Burnham v. Superior Court, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) ...............23
J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780, 2788 (2011) ..............................16

## Delaware Cases

LaSalle Nat'l Bank v. Perelman, 82 F. Supp.2d 279, 295 (D.Del.2000).......................33
Committee for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 823 (9th Cir. 1996)................31
Elf Atochem North America, Inc v Jaffari, 727 A.2d 286, 287 (del. 1999) ...................30
Geyer v Ingersoll Publications Co., 621 A.2d 784, 793 (Del. Ch. 1992) .......................31
Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D.Del.1989.................33
Wellman v Dow Chemical Co., No. 05-280-SLR, at 2 (D. Del. March 20, 2007).....................30

## Delaware Statutes

Del. Code Ann. Tit. 8, § 102(b)(6) (2009) ....................................................................31

## <u>COUNTER - STATEMENT OF ISSUES PRESENTED</u>

I. Jurisdiction Attaches To Scott Anderson Under Michigan's "Long Arm" Statute Because he deliberately engaged in significant activities within Michigan, and has created continuing obligations between himself and Adelson in Michigan, as a result, he manifestly has availed himself of the privilege of conducting business in Michigan, in addition to the 10 corporate entities registered in Michigan under Ocwen Financial, Corp's, umbrella including Ocwen Loan Servicing, LLC, to which Scott Anderson is acting Executive Vice President and Chief Servicing Officer.

To these questions:

 Adelson answers, "Yes"

 Anderson would answer, "NO"

 This Court should answer, "Yes"

II. Scott Anderson Utilized His Employment With Ocwen, MERS, & HSBC To Perpetrate A Fraud In Michigan and as he is an active corporate officer, he can be held personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf; in addition, Scott Anderson can also be held personally liable by reason of his own conduct.

To these questions:

 Adelson answers, "Yes"

 Anderson would answer, "NO"

 This Court should answer, "Yes"

v

## INTRODUCTION

This cause of action arises out of intentional torts of conversion, conspiracy, and fraud through a wrongful foreclosure against Adelson by Ocwen Financial Corp, Ocwen Loan Servicing, LLC, (*herein after jointly* Ocwen) Mortgage Electronic Registration Systems, [1] (MERS) HSBC Bank USA, N.A., as trustee on behalf of ACE Securities Corp, Home Equity Loan Trust Series 2007-HE1, *Asset Backed Pass-Through Certificates*, (*herein after* HSBC/ACE) and its corporate officer Scott Anderson (Scott Anderson) in his official and personal capacities.

Defendants are on their fifth (5th) law firm, each one larger than the last; and each presents itself- puffing up their chest - and attesting to **false and inaccurate material facts**.  Scott Anderson utilized his positions as Executive Vice President and Chief Servicing Officer of Ocwen, and Vice Presidents, of HSBC and MERS to effect a claim of title interest, through a fraudulent mortgage assignment and wrongful foreclosure in property owned by Plaintiff, Wendy B. Adelson's (Adelson), located at 3630 Waldon Road, Lake Orion, Michigan, (Property). [Dkt #43-28]  None of the Defendants paid any consideration for their claimed title interest claim in Adelson's Sebring Capital Partners, LP (Sebring) loan. [Dkt #43-1] On or about June 5, 2008 **one (1) year after** the assignment was recorded Ocwen paid MERS $4.95 to be listed as the Adelson's loan servicer [Dkt #43-24] MERS took the money and listed Ocwen as her servicer, **but Sebring still remains the Lender** and the **loan is still deactivated and paid-in-full**. [Dkt #43-22 & 26]    Scott Anderson is the controller of mortgage loan servicing activities for Ocwen.  Scott Anderson's criminal acts

---

[1] Defendant claims FAC incorrectly names MERSCORP Holdings, Inc., f/k/a MERSCORP, Inc., and Mortgage Electronic Registration Systems.

The Sebring Capital Partners, L.P., Mortgage contains "ONLY" the entity named "Mortgage Electronic Registration Systems" (MERS).

related to Adelson's Sebring loan was intended to defraud Adelson of her equity and was directed at Michigan.

Ocwen Financial Corp, under its umbrella has certificates of authority to transact business in Michigan, for ten (10) corporations: 1) Ocwen Business Solutions, Inc., 2) Ocwen Consumer Solutions, Inc., 3) Ocwen Financial Insurance Services, Inc., 4) Ocwen Financial Services SRL, LLC, 5) Ocwen Financial Services, Inc., 6) Ocwen Financial Solutions Private Limited, 7) **Ocwen Loan Servicing, LLC**, 8) Ocwen Mortgage Company, LLC, 9) Ocwen Mortgage Servicing, Inc., and 10) OcwenFinancial Insurance Services, Inc.  MCL § 450.1217 It maintains two registered offices in Michigan, (1) CSC Lawyers Incorporation Service located at 601 Abbott Road, East Lansing, Michigan and (2) The Corporation Company located at 30600 Telegraph Road Suite 2345, Bingham Farms, Michigan; they file yearly reports with the State of Michigan, and includes any revenues derived from Michigan in its tax returns. **(Exhibit 1 – LARA)**

Although Scott Anderson maybe a resident of Florida, he maintains substantial ties and conducts business on a regular basis in Michigan; which includes the use of postal mailing, emails, telephone calls, in person, attorneys, resident agents, and/or meeting in Michigan and through the internet on a regular or semi-regular basis. Scott Anderson deliberately engaged in significant activities within Michigan, and has created continuing obligations between himself and Adelson in Michigan, as a result, he manifestly has availed himself of the privilege of conducting business in Michigan when he instructed Bryan Potestivo to record an assignment of mortgage which purports his "notarized signature" on his behalf into the Michigan Oakland County Register of Deeds. Michigan as the forum State can exercise general personal, limited and specific jurisdiction over Scott Anderson based upon he **"expressly aimed" "his intentional, and tortious, actions" in Michigan.**  Therefore, Scott Anderson's allegations that the **only** connection to Michigan is

Plaintiff's Federal Amended Complaint and unsupported by an affidavit, his claims should be construed as false and unsubstantiated by facts.

## BACKGROUND

On September 26, 2006, purchased her Property for $210,000. To accomplish this purchase, she delivered a promissory note in the face amount of $178,500 with a 7.745% interest rate to the lender, Sebring.  She simultaneously executed a separate mortgage indenture in favor of MERS as "nominee for [Sebring] and [Sebring]'s successors and assigns." At the conclusion of this closing, **Sebring advised its closing agent, Transnation Title (Transnation) to shred the mortgage and promissory note on September 26, 2007 executed by Adelson -** because it had "changed its mind" and were not going to fund this loan at the 7.745% interest – but would fund the loan at 9.999% interest.

As a result, **a second closing was conducted on September 27, 2006**; Transnation experienced issues with its office equipment and had difficulty with its printing of the amended loan documents; at the conclusion of this closing Adelson and Marsha Grabill (*Transnation closing agent*) copied each and every page of the closing package so Adelson would have a copies of everything, and they both checked each copy - page for page to ensure each copy was legible and no pages were missing.  Adelson's copy of the closing package **does not contain a "Promissory Note."**  It was not that Adelson wouldn't sign the note on September 27, 2006, it was that the note was not reprinted or represented to her and **it was never signed** by Adelson on September 27, 2006.  The Sebring mortgage was recorded on November 03, 2006, in the Oakland County Register of Deeds in Liber 38341 Page 483 and the loan number affixed to it is 5152843; Sebring's MERS identification number is 1002656; the number utilized by MERS to identify the mortgage is as follows: [100265600005152843] and it is **<u>not</u>** secured by a promissory note. [Dkt #43-1]

On December 19, 2006, Ocwen Loan Servicing mailed Adelson a letter indicating Sebring had assigned its servicing rights to it. The letter provided for a loan no. 80331044.  [Dkt # 43-4] At no time since December 19, 2006, has Ocwen or HSBC/ACE ever referenced the loan number affixed to the recorded mortgage 5152843.  Adelson is under no obligation to loan no. 80331044. MERS has admitted number no. 5152843 was deactivated as paid-in-full on December 10, 2006, and there is no certificate of owner from Sebring to Ocwen nor HSBC/ACE [Dkt #43-22]

Adelson began paying Ocwen her Sebring payments on January 2, 2007.  Even though her payments were (*paid through May 15, 2007*).  On February 6, 2007, she received several collection calls a day from Ocwen.  In April of 2007 the activity expanded to include late pay letters and certified mail.  On April 15, 2007, she contacted Ocwen about its collection methods [Dkt #43-3] and requested "proof of ownership or entitlement to collect payments" and her payment history. As Ocwen failed to provide the information, on April 29, 2007 she made her final request upon Ocwen and was told:

> "***ownership of her mortgage was none of her fuc…g business***."

On May 01, 2007, Adelson met with Michael White (Mr. White) of Summit Mortgage (Summit) about refinancing and her concerns her *fico* score had been damaged by Ocwen. (Dkt #43-7).  Mr. White advised Adelson that "Sebring's mortgage licenses had been revoked on December 1, 2006;" and if Ocwen was involved she should check the Oakland County Register of Deeds.  Mr. White verified her *fico* score, from January of 2007, through May 1, 2007, Ocwen's false reporting had caused her *fico* score to decrease from 670 to 501, when it should have been in the 700-800 range. [Dkt #43-7]  Adelson established an Escrow account [Dkt #43-3], verified with the Oakland County Register of Deeds that no assignment from Sebring to Ocwen was recorded [Dkt #43-8] and certified mailed to Ocwen her Qualified Written Request (QWR).  [Dkt #43-42]

Seven (7) days later on June 5, 2007**,** after signing for the QWR, Ocwen published a Notice of Foreclosure sale in the Oakland County Legal News for a July 3, 2007, Sheriff Sale, when there was **no _default_.** [Dkt #43-10]   The Notice of Foreclosure posted on the property was the first notice Adelson had of HSBC/ACE's claim of title interest.  Adelson filed the instant matter in the Oakland County 6th Circuit Court on June 25, 2007, and immediately hand served Potestivo with a copy of the lawsuit. On June 27, 2007 two (2) days later, Potestivo provided her with the assignment dated June 5, 2007 from Sebring to HSBC/ACE, but recorded in the Oakland County Register of Deeds on June 27, 2007. [Dkt #43-28]

Adelson provided Potestivo copies of her payments paid to Ocwen totaling $6,532.53**,** and advised there is **no default** [Dkt #43-3]  The pending July 3, 2007 Sheriff Sale was postponed from week to week until cancelled by Potestivo, after Potestivo admitted **there was no default**. [Dkt #43-7]  During settlement negotiations on July 27, 2007, Defendants timely removed this matter from the Oakland County Circuit Court to federal court and it was assigned to the Honorable Judge Paul V. Gadola. [Dkt #1]   In December 2007, it was transferred to the Northern District of Illinois where it was consolidated with Multi District Litigation No. 1604, a proceeding against Ocwen Financial Corporation and Ocwen Loan Servicing, LLC. (Dkts #7-9) Although the MDL proceeding was resolved December 10, 2010, this case remained pending in the Northern District of Illinois until it was remanded to this Court in September 2015 and reassigned to the Honorable Judge Terrence Berg. (Dkts #12-16).  Defendant, HSBC/ACE was not part of the 1604 MDL.  On October 15, 2014, Defendant produced a copy of a promissory note [Dkt #43-15] which is questionable, first because Adelson did not sign it, the signature lines are slanted an typeset is at an angle, and it contains different interest rates, it includes the 7.745% and includes a page containing Adelson's signature from the September 26, 2006, closing (*earmarked for shredding*).

In December of 2015, Adelson had an opportunity to inspect the claimed original note and mortgage. Upon her visual inspection, the ink on the alleged promissory note color shade is different from the coloring on the mortgage documents. In any event, these documents will need to be examined and tested by a forensic expert to determine whether the ink on both the note and the mortgage are from the same ink pen utilized to sign the documents on September 27, 2006.

## I.    LOAN PERFORMANCE

The June 5, 2007 Notice of Foreclosure claimed $186,607.68. Subtracting the Original loan amount of $178,500.00 left a difference of $8,107.68. To believe Ocwen's claimed default **one would have to believe** during the six (6) month period it serviced Adelson's loan, **she only paid $808.38**. Adelson tendered her October 1, 2006 payment at closing, and paid Sebring directly both her November 1, and December 1, 2006 payments; and as of December 1, 2006 the loan was current and performing pursuant the agreed upon terms. The payment history provided to her on June 3, 2007 shows she paid Ocwen $6,532.53**, with no late pay, late fees, additional charges and no non-sufficient funds payment returns**. [Dkt #43-3-2] **This statement accurately details Adelson payments made to Ocwen**.

The payment history of June 3, 2007, provides $6,532.53, was paid to Ocwen.

| | | | |
|---|---|---|---|
| 1. | 12/29/2006 | Beginning Balance | $ 178,500.00 |
| 2. | 12/29/2006 | Suspense Payment | $ 1,000.00 |
| 3. | 01/02/2007 | Payment | $ 900.00 |
| 4. | 02/22/2007 | Suspense Payment | $ 1,000.00 |
| 5. | 03/05/2007 | Payment | $ 1,000.00 |
| 6. | 03/19/2007 | Suspense Payment | $ 1,000.00 |
| 7. | 04/02/2007 | Payment | $ 1,527.01 |
| 8. | 04/03/2007 | Payment | $ 105.52 |

Adelson's monthly payment is $1,486.01, from January 1, 2007, - June 1, 2007, the total amount due was $8,916.01. Adelson paid Ocwen $6,523.53. A difference of $2,383.48 which was not delinquent but the **remaining $897.47 from her May 1, 2007 payment and her June 1, 2007 payment of $1,486.01,** were intentionally withheld while she was disputing Ocwen's

entitlement to collect her loan payments.  **The $2,383.48 had been timely deposited into an Escrow account pending resolution of the dispute.** [Dkt #43-3-2] Further, the June 1, 2007 payment was still within its 10-day grace period and could not have been construed as late. {*the additional entries listed below represent entries added in addition to or altered the entries shown in the June 3, 2007 history above*}

On June 13, 2007, ten (10) days after later, Ocwen changed the {1st entry from December 29, 2006-*Beginning Balance to October 8, 2006 - Loan Disbursement*} it included 10 additional entries {*i.e., $1,000.00, Payment Reversal "NSF" – which never occurred as* **this specific payment made through the Waterford, Michigan Krogers Grocery Store MONEYGRAM**} Clearly it was altering the payment history so the loan appeared in default when it was not. [Dkt #43-3]

**June 13, 2007, History Entries Added *in Addition* the June 3, 2007 Stated Above**

| | | | |
|---|---|---|---|
| 1. | 10/8/2006 | Loan Disbursement | $ 178,500.00 |
| 2. | 2/21/2007 | Legal/Collection Expense | $      4.67 |
| 3. | 3/5/3007 | Payment Reversal | $     1,000.00 |
| 4. | 3/22/2007 | Property Evaluation | $    110.00 |
| 5. | 3/10/2007 | Late Charge | $     74.30 |
| 6. | 4/4/2007 | Legal Collection Expense | $      4.67 |
| 7. | 4/01/2007 | Late Charge Assessment | $     74.30 |
| 8. | 4/17/2007 | Legal Collection Expense | 4.67 |
| 9. | 5/8/2007 | Property Assessment | $     10.50 |
| 10. | 5/1/2007 | Late Charge Assessment | $     74.30 |

On May 11, 2015, seven (7) years later, Andrew Wayne of Trott Law mailed to, Robert Harris Adelson's attorney copies of the "alleged validation of debt," which included Ocwen's "History."  Now it's {1st entry changed from 12/29/2006*, Beginning Balance* > 10/08/2006*, Loan Disbursement* > 10/8/2008*, New Loan Disbursement (NLD) Loan Disbursement.*  Clearly Defendants have altered the payment history to fit its present need. [Dkt #43-3]   None of Defendants are able to claim they "FUNDED" loan on September 27, 2006, based upon the fact, Adelson and her sister Lori Adelson "CASHED" the Sebring check at Chase Bank on September 27, 2006.  So it would have been impossible for Ocwen to have funded the loan *12 days "AFTER" the check was cashed*.

**May 11, 2015 History Additional Entries**

| | | | |
|---|---|---|---|
| 1. | 10/8/2006 | NLD Loan Disbursement | $178,500.00 |
| 2. | 12/29/2006 | PAP Partial/Suspense Pay | $   1,000.00 |

|     |           |                                    |            |
|-----|-----------|------------------------------------|------------|
| 3.  | 1/29/2007 | RSP Regular Spread                 | $    900.00 |
| 4.  | 1/31/2007 | IVT Investor Pool/Pool T O         |            |
| 5.  | 1/31/2007 | IVT Investor Pool/Pool T I         | $178,500.00 |
| 6.  | 2/27/2007 | PAP Partial/Suspense Pay           | $  1,000.00 |
| 7.  | 3/05/2007 | PAP Partial/Suspense Pay           | $  1,000.00 |
| 8.  | 3/05/2007 | PAP Partial/Suspense Pay Returned  | $  1,000.00 |
| 9.  | 3/19/2007 | PAP Partial / Suspense Pay         | $  1,000.00 |
| 10. | 4/02/2007 | PAP Partial / Suspense Pay         | $  1,527.01 |
| 11. | 4/03/2007 | Regular Payment                    | $    105.00 |

This May 11, 2015, history indicates the loan was put into an Investor Pool of ACE Securities Corp Home Equity Trust 2007-HE1. This is also not possible for the reason that the ACE loan pool closed January 30, 2007, (5) months before the June 5, 2007, assignment was fabricated. This loan is never included in the trust, in fact the trust even states that Sebring's mortgage license were revoked on December 1, 2006. [Dkt # 43-21].

## II.   THE WHY?

In December of 2006, Adelson in equity in her Property was approximately $50,000 and in January of 2007, she was offered $350,000 from a builder who intended to build a sub-division adjacent to her land. Adelson had prevented the building licenses from being issued because its projected entrance/exit easement would have been directly across from her horse stable, and interfered with the animals being unable to rest in their stable at night. In the United States District Court for Galveston County Texas *Sealy Davis v Ocwen Financial Corp,* Docket No. 04-cv-1469, who had experienced similar issues with Ocwen and conducted a jury trial on or about November 15, 2005. [see November 15, 2005 Trial Transcript Excerpt Testimony of Ronald Davis] **(Exhibit -2)** Ronald Davis was employed by Ocwen from March of 1996 through 2003. He was hired off the street with no experience as a loan collector and earned a base salary of $30,000 a year. 29 days later he moved up to a loan resolution consultant (LRC) and later a supervisor. While

employed by Ocwen he was responsible for dealing with creditors and understanding Ocwen's

policies in relation to customers. Ronald Davis testified to the following relevant facts:

> While employed by Ocwen he would from time to time be given bonuses or extra money through Ocwen's ICP program and extra money call bumps and it was referred to a third party take out, and Ocwen paid extra money to him for that.  He described a bump as when a borrower lost their home to foreclosure they had a broker list to call to purchase the home.  **If the broker purchased the home he received extra money, which was called a bump**.  It was a regular practice to return payment back to customers.  Ocwen **required a minimum of a three (3) payment delinquency to transfer the loan into its foreclosure department**.  If Ocwen wanted the loan sent to its foreclosure department, the collectors were instructed to place the account on a foreclosure hold, and return payments to the customer.  Each collector had a portfolio of 250-300 loans.  He would look through each loan and **target the loan with equity**, and he would **reject payment so the loan went to foreclosure and he would get a bump**.  **Ocwen's computer system regularly rejected payments so late charges were added and more fees were added before foreclosure**.  The system allowed him to go in there and plug in the numbers for percentages of the house, what the loan to value was, what Ocwen got for the home it was up to him and he let it go to foreclosure so the customer would have to come up with the money he was asking for, including attorney fees and costs for our bumps, extra money in his pocket.  **If there is equity in the house he could find a broker to buy the home in a heartbeat and that is what he did**.  Once the customer went into foreclosure, he could refuse to put them on a plan and refuse payment, and if there was equity, it would benefit financially by the refusal.  The foreclosure department would then move the loan into the real estate owned department (REO) this department would sell the home and receive extra cash and trips which they shared with him and the other collectors in LCR.  **The REO manager steals the equity for a bump.  So even though Ocwen doesn't get the equity, they somehow figure a way to steal it from the lender through the bump. Ocwen had a plan to steal someone's equity from them. By selling the home to a third-party or broker.  If it's in REO, it goes to a broker, he will get a kickback off it.**
>
> He targeted medium and high in the system. He would check to see what the percentage was, what equity was there, what the servicer or Ocwen wanted to get his bump.  He would get a broker out there to estimate what it was worth, and he would do anything he could to get that money.  <span style="color:red">**[The bump would be the difference of the percentage that Ocwen or the servicer wanted on the sale of the home.  If they wanted 88% of the market value for example: if the home was valued at $100,000, and it sold at $110,000, the lender would get $97,680, and $12,320 would go to Ocwen and divided up between Ocwen, the REO and other LCR's.]**</span>  The ICP program was based on 30 resolutions out of his 300 portfolio.  After that, he would receive a higher percentage per deal, but bumps came in separately. Ocwen would have secret foreclosure. If he didn't care about the loan, he would just tell the customer what they wanted to hear and he would claim letters to the customer which were never sent, he would lie to the customer about the status of their loan.  The secret was from the customer.  He would call the customer and work out a plan and then don't. He attended meetings Bill Erbey the owner of Ocwen Federal Bank, which he

referred to as luncheons. Bill Erbey set out his view of how Ocwen should Conduct business about D&E paper that he bought from HUD and other loan servicing account, that those people have no money, probably won't have no money to get their houses back out of foreclosure and there are some that have equity which would help build his bonus structure.

The destruction of Adelson's credit and the slandering of the title to her home was based upon the pure greed of Scott Anderson, who saw a substantial amount of equity, devised and executed a plan to steal that equity from Adelson. Although the Property today, lacks equity and it is underwater. The fact Scott Anderson through Ocwen only paid $4.95 to MERS to claim its HSBC/ACE title interest, he would benefit substantially if he is able to steal the Property from Adelson. On June 5, 2007, the market value was in excess of $250,000; and the present market value is approximately $162,701 based on Zillow (*May 2, 2016*) which Scott Anderson, saw as a potential **bump of $162,696.05** for himself and his accomplices; as there is no outstanding balance to pay a lender because the loan was paid-in-full on December 10, 2006.

## STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, this Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 724 (6th Cir.1996). The Court must "construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Lillard,* 76 F.3d at 724 (quoting *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994)).

## ARGUMENTS

## I.   JURISDICTION ATTACHES TO ANDERSON UNDER MICHIGAN'S "LONG ARM" STATUTE

Although this matter is before the court on Defendants' motion to dismiss, Plaintiff has the burden of establishing the district court's jurisdiction. *Neogen Corp. v. Neo *818 Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir.2002). Where the court does not conduct an evidentiary hearing on the issue of personal jurisdiction in considering a Rule 12(b)(2) motion, the plaintiff "need only

make a prima facie showing of jurisdiction."[2] In ruling on a 12(b)(2) motion, the "court will not

consider facts proffered by the defendant that conflict with those offered by the plaintiff," *Neogen,*

282 F.3d at 887, and must construe the facts presented in the pleadings and affidavits in the light

most favorable to the non-moving party.[3] See *Serras v. First Tenn. Bank National Association,*

875 F.2d 1212, 1214 (6th Cir.1989). Here, Scott Anderson contact in Michigan meets, general,

specific and limited personal jurisdiction.

In a diversity of citizenship, this Court's exercise of personal jurisdiction must be both (1)

authorized by Michigan law and (2) in accordance with the Due Process Clause of the Fourteenth

Amendment. *Neogen,* 282 F.3d at 888.  In a diversity actions such as the case at bar, a federal court

applies the law of the forum state in which it sits to determine whether personal jurisdiction is

appropriate. The court may maintain jurisdiction over a non-resident defendant only in accordance

with the forum state's long-arm statute and the limitations of the Due Process Clause of the United

States Constitution. *Reynolds v. Int'l Amateur Athletic Fed'n,* 23 F.3d 1110, 1115 (6th Cir. 1994);[4]

## A. <u>Exercise of Specific Jurisdiction</u>

Specific jurisdiction arises when the defendant has sufficient minimum contacts that arise

from or are related to the cause of action. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th

Cir. 2000). The plaintiff must establish that (1) the defendant purposefully availed himself of the

privilege of acting in the forum state or intentionally caused a consequence in the forum state; (2)

the cause of action arose from the defendant's activities in the forum state; and (3) the acts of the

---

[2] Id., quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir.1996).
[3] See also, *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir.2000).
[4] *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Third Nat'l Bank v. WEDGE Group, Inc*., 882 F.2d
    1087, 1089 (6th Cir. 1989).

defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction reasonable.[5]

As Ocwen and HSBC/ACE have admitted to possessing no ownership or interest in Adelson's Property that leaves Scott Anderson to claim owner of mortgage note secured by real property in forum state which purposefully availed himself of laws of forum state and is subject to jurisdiction of forum state without further contact; *Jeffreys v. Exten*, 784 F.Supp. 146 (D.Del.1992) (holding mortgage on property in forum state is alone enough to establish interest in real property and purposeful availment for purposes of specific personal jurisdiction). This Court should finds Scott Anderson has purposefully availed himself of Michigan and the benefits and protections of its laws by owning an interest in real property located within Michigan.

### B. Exercise of Limited Jurisdiction

Michigan's "long-arm" statute extends "limited" jurisdiction over individuals pursuant to M.C.L. § 600.705:

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:
>
> (1) The transaction of **any** business within the state.
> (2) The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort.
>     [...]
> (5) Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.

M.C.L. § 600.735. Limited jurisdiction extends only to claims arising from the Defendants' activities within Michigan or those which had an in-state effect. *Neogen*, 282 F.3d

---

[5] Id.; see also *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001); *Aristech Chem. Inter. Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 628 (6th Cir. 1998); *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

at 888.[6] For specific jurisdiction to exist in a diversity case, two factors must be satisfied: the forum state long-arm statute, and constitutional due process. *Air Prods,* 503 F.3d at 550;[7] The district court found that Michigan's long-arm statute was satisfied because it allows personal jurisdiction over a corporation that is involved in "the transaction of **any** business in the state." Mich. Comp. Laws § 600.715(1); see *Sifers v. Horen,* 188 N.W.2d 623, 624 n.2 (Mich. 1971) (explaining that "[t]he word **'any'** *means just what it says*. *It includes 'each' and 'every'*"). Furthermore, the "slightest act of business in Michigan" is a sufficient business transaction for purposes of the statute.[8]

In the present case, on or about June 5, 2007 Scott Anderson conspired with Bryan Potestivo to fabricate a mortgage assignment which purports Scott Anderson's "notarized signature" as the authorized party claiming status as Vice President of MERS to effectuate a transfer of the Sebring loan to HSBC/ACE, (*two non MERS members*); Scott Anderson instructed Bryan Potestivo to record the assignment in the Oakland County Register of Deeds on June 27, 2007 [Dkt #43-28].  Scott Anderson **"expressly aimed" "his intentional, and tortious, actions" in Michigan.**  As a result, **he deliberately engaged in significant activities within Michigan**, and has created continuing obligations between himself and Adelson, in Michigan, he manifestly has availed himself of the privilege of conducting business in Michigan at the time when he instructed Bryan Potestivo to record the assignment purporting his "notarized signature" in the Oakland County Register of Deeds in Michigan. The assignment itself is a contract.   The assignment attached to Adelson Amended Complaint [Dkt # 43-28] is the assignment Defendants

---

[6] "[C]ontact with and activity directed at a sovereign may justify specific jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'" *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2788 (2011) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).
[7] see *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 319-20 (1945).
[8] *Neogen Corp. v. Neo Gen Screening, Inc*., 282 F.3d 883, 888 (6th Cir. 2002); see *Oberlies v. Searchmont Resort, Inc*., 633 N.W.2d 408, 413 (Mich. Ct. App. 2001).

attorney Potestivo & Associates **deleted information off of it prior to** serving Adelson a copy on

June 27, 2007 and **is not an exact mirror copy** of what was filed in the Oakland County Register

of Deeds.  On May 4, 2016, Adelson obtained a **"true copy"** of the June 5, 2007 assignment

directly from the Oakland County Register of Deeds.  The **actual recorded assignment** provides

on the 1st page a hand written entry which provides: **(Exhibit 3)**

> **Drafted by:**
> **Bryan A. Potestivo**
> **811 South Boulevard Suite 100**
> **Rochester Hills, Michigan 48307**

The contract speaks for itself.  Bryan A. Potestivo an attorney residing and practicing law

in Michigan drafted the June 5, 2007 assignment, sent his draft to Florida where Scott Anderson

purported to sign his name in front of a notary and then had to mail the document back to Bryan

Potestivo, in Michigan with the instruction that Bryan Potestivo file the document on Scott

Anderson's behalf.

The Courts have traditionally applied a broad reading to Michigan's Long Arm Statute and

have construed the language of the Statute literally holding that any business conducted within the

State is sufficient to constitute activity with the State.  Further, Courts have held that Michigan's

Long Arm Statue applies in situations where even the slightest contact has occurred. *Lanier v Am.*

*Board of Endocontics*, 843 F2d 901 (6th Cir).  In that case, the Court held that the word "**any**" in

the Long Arm Statue covered each and every contact and found jurisdiction proper when only the

slightest activity was present. Id.  In *Lanier*, the Court exercised jurisdiction of the defendant where

the contact consisted solely of telephone calls between the parties and the mailing of an application

from Illinois to Michigan.  Moreover, the lack of Scott Anderson's physical presence in the forum

state is not determinative.[9]  Scott Anderson's actions has cause tortious injuries to Adelson.

### C.  Exercise of General Personal Jurisdiction

In accordance with MCL 600.711, the demonstration that any of the following relationships

exists between a corporation and the State of Michigan comprises a sufficient basis for a Court to

exercise general personal jurisdiction over a corporation:

(1) Incorporation under the laws of this state.
(2) Consent, to the extent authorized by the consent and subject to the limitations
   provided in MCL 600.745.
(3) The carrying on of a continuous and systematic part of its general business within
   the state.

Michigan law provides that when a corporation conducts a "continuous and systematic part

of its general business" in Michigan, the state has general personal jurisdiction over the

corporation. Mich. Comp. Laws § 600.711(3). The "continuous and systematic" threshold tracks

the language of *Helicopteros,* 466 U.S. at 416, 104 S. Ct. at 1873 (general jurisdiction arises when

foreign corporation's contacts with forum state are "continuous and systematic"). In order for

general jurisdiction to lie, a foreign corporation must have a substantial amount of contacts with

the forum state.  Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1067, at

298 (2d ed.1987). In assessing contacts with a forum, courts have considered such factors as: (1)

whether the corporation solicits business in the state through a local office or agents; (2) whether

the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to

which the corporation holds itself out as doing business in the forum state, through advertisements,

listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.

Id. at § 1069, at 348-55 (collecting cases).

---

[9] *Witbeck v Bill Cody's Ranch Inn,* 428 Mich 659 (411 NW2d 439 (1987). See also, *Neal v Janssen* 270 F3d 328 (6th
   Cir. 2001).

Taking the facts alleged by Adelson in her Amended Complaint as true, the Court must determine if the contacts of Scott Anderson individually and through Ocwen are continuous and systematic contacts so as to subject him to general jurisdiction of this Court. The actions Adelson alleges against Scott Anderson are imputable to him because he served as the controller of Ocwen's loan servicing division, there are no allegations that Ocwen Loan Servicing is a shell corporation. Adelson asserts that any assignment and claims of property interest in Scott Anderson's name were recorded by Scott Anderson in his individual capacity. The fact that Scott Anderson is the controller of Ocwen's loan servicing division – should as a matter of law, confers personal jurisdiction. Jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation. However, personal jurisdiction may be applied to those officers of a corporation "where an out-of-state agent is actively and personally involved in conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether he purposely availed himself of the forum and the reasonably foreseeable consequences off that availment." *Balance Dynamics Corp. v Schitt Industries, Inc*, 204 F. 3d 683, 698 (6th Cir. 2000).

In personam jurisdiction must first be authorized by the state legislature in order to exercise jurisdiction over nonresidents.[10] It must also be determined whether the jurisdiction so authorized is consistent with Fourteenth Amendment due process as that concept is delineated in the "minimum contacts" formula of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).[11] The principles set forth in International Shoe were recently reaffirmed

---

[10] *Elliot v. Caribbean Utilities*, supra, 513 F.2d at 1179; *Wells Fargo & Co. v. Wells Fargo Exp. Co*., 556 F.2d 406, 414 (9th Cir. 1977); *Vespe Contracting Co. v. Anvan Corp*., 433 F. Supp. 1226, 1232 (E.D.Pa.1977)

[11] *McGee v. International Life Insurance Co*., 355 U.S. 220, 78 S. Ct. 199, 2 L.Ed.2d 223 (1957); and *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L.Ed.2d 1283 (1958).

and extended to situations not present in the instant case.[12] However, a key factor in weighing the strength of this state's connection is whether the cause of action arises out of defendants' attempts to benefit from the laws of Michigan by entering the market here.[13]  Scott Anderson has directed his criminal conduct at Michigan, all of which were freely and intentionally done, and this cause of action arose out of those acts. Scott Anderson's involvement with this State, measured by the minimum contacts concept, clearly compels the Court to extend jurisdiction over Scott Anderson. Such jurisdiction is not unreasonable, nor does maintenance of the suit "offend 'traditional notions of fair play and substantial justice."[14] In Michigan, intentional interference with a known contractual relationship gives rise to an action in tort if the interference is malicious or without justification.

In addition to M.C.L. § 600.735(1), Adelson's claims can be analyzed under M.C.L. § 600.705(2) and § 600.735(2) for fraud and misrepresentation because Adelson claims she was deceived by Scott Anderson's representations that Ocwen Loan Servicing had been assigned the servicing rights of Sebring, and collected $6,532.53, from Adelson when Ocwen had no authority or entitlement; and Scott Anderson acting as Vice Presidents of Ocwen, MERS, and HSBC Sebring authority to effect the transfer from Sebring to HSBC/ACE, in light of the fact that this occurred over 6 months after Sebring had its mortgage licenses revoked.  Moreover, he acted as assignee, assignor and as receiver clearly a trifold conflict of interest.

---

[12] See *Shaffer v. Heitner*, 433 U.S. 186, 97 S. Ct. 2569, 53 L.Ed.2d 683 (1977).

[13] *McGee v. Int'l Life,* supra, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; See *United Advertising Agency, Inc. v. Robb*, 391 F.Supp. 626, 630 (M.D.N.C.1975); *Fieldcrest Mills, Inc. v. Mohasco Corp.,*442 F.Supp. 424, 428 (M.D.N.C.1977).

[14] *Int'l Shoe v. Washington, supra*, 326 U.S. at 116, 66 S. Ct. at 158. See *Miller Brewing Co. v. Acme Process Equipment Co.,* 441 F. Supp. 520 (E.D.Wis.1977).

**D.** **Purposeful Availment Arising From Scott Anderson's Activities**

Purposeful availment analysis turns upon whether Scott Anderson's contacts are attributable to his own actions or solely to the actions of Adelson ... [and generally] requires ... affirmative conduct by Scott Anderson which allows or promotes the transaction of business within the forum state." [15]   It is difficult to not see how Scott Anderson, utilizing his positions at Ocwen, Delaware corporations, which conducts regular business in Michigan, utilizing its ten (10) Michigan corporations, it maintains two (2) resident offices and files yearly reports with the State of Michigan.   Scott Anderson knew the assignment had to be passed to Bryan Potestivo in Michigan in order for it to be recorded in the Oakland County register of deeds in Michigan. Purposeful availment is the most important criterion. *Kerry Steel,* 106 F.3d at 150. The significance of purposeful availment is that it "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), and "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1986) (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984); *World-Wide Volkswagen*, 444 U.S. at 299)).

Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State. Thus, ***where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and the residents of the forum, he manifestly has availed himself of the privilege of conducting business there*** . . . *Burger King Corp., v. Rudzewicz,* 471 U.S. 462, 475 (1985).

---

[15] *Rambo v. American Southern Ins. Co.* 839 F.2d 1415, 1420 (10th Cir.1988) (quoting *Decker Coal v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir.1986)).

In *McGee v. International Life Insurance Co.*, 355 U.S. 220 (1957) the Supreme Court held that the issuance of a single life-insurance policy to a California resident was sufficient to justify the exercise of jurisdiction over a party located in Texas. Likewise, in *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996), the Sixth Circuit found that Ohio had personal jurisdiction over a Texas resident who purchased a subscription from *CompuServe* and who sent computer software over the internet to the *CompuServe* system in Ohio.   The court upheld the assertion of jurisdiction over defendants who have purposefully "reached out beyond" their State and into another by, entering a contractual relationship that "envisioned continuing and wide-reaching contacts" in the forum State,[16] or by circulating magazines to "deliberately exploit" a market in the forum State,[17] And although **physical presence in the forum is not a prerequisite to jurisdiction**,[18] **physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact**. [19]

The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendants to California, not just to the plaintiff.  The strength of that connection was largely a function of the nature of the libel tort.  The defendants in *Calder* argued that no contacts they had with California were sufficiently purposeful because their employer was responsible for circulation of the article.[20] The court rejected that argument. **Even though the defendants did not circulate the article themselves, they "expressly aimed" "their intentional, and allegedly tortious, actions" at California because they knew the National Enquirer "had its largest circulation" in'' California**.[21] *Calder v Jones*, 465 U.S. 783 (1984)

---

[16] *Burger King, supra*, at 479–480,
[17] *Keeton, supra*, at 781.
[18] *Burger King, supra*, at 476,
[19] See, e.g., *Keeton, supra*, at 773–774.
[20] See *Calder v. Jones*, 465 U. S. 783, 789 (1984).
[21] *Milliken v. Mever*, 311 U.S. 457, 463 (1940)).

Scott Anderson knew his tortious conduct in Michigan would cause harm to Adelson at the time he affixed his signature to the June 5, 2007 assignment and directed it be recorded it in the register of deeds and he "expressly aimed and intentionally targeted his intentional conduct at Michigan. The effects test shifting the focus from Adelson's relation to the forum to an emphasis on Scott Anderson's intended contact with the forum. Here, Scott Anderson's contacts with Michigan are not "random, fortuitous or attenuated contacts" or "unilateral activity of Adelson. Michigan as the forum State can exercise jurisdiction over Scott Anderson based upon his "expressly aimed" "their intentional, and allegedly tortious, actions" in Michigan. Adelson has presented evidence that Scott Anderson directed his attorney Bryan Potestivo to prepare the assignment, and then instructed Bryan Potestivo to file the assignment on his behalf in Oakland County Register of Deeds in order for him to conduct a Sheriff Sale. Scott Anderson knew that the assignment which purports his notarized signature would be sent to Michigan because the preparation and execution of the assignment was performed **with the intent to send it to Michigan to be filed** in the Oakland County Register of Deeds and it was performed with malice to defraud Adelson out of her equity in her home. As a result, he purposefully availed himself of the privilege of conducting business in Michigan. Accordingly, the exercise of personal jurisdiction over Scott Anderson satisfies the purposeful-availment test.[22]

The Sixth Circuit has recently reiterated that the "arising out of" requirement" is met if the **cause of action was 'made possible' by or 'lies in the wake of' the defendant's contacts with the forum state**."[23] Adelson contends Scott Anderson is subject to the Michigan long-arm statute

---

[22] A Court gains personal jurisdiction over a person who is served with process within the Court's jurisdiction, regardless of whether the person lives within the jurisdiction or is just visiting. *Burnham v. Superior Court*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). This type of personal jurisdiction is also referred to as transient jurisdiction because the person served does not live within the jurisdiction, but is transient, i.e., just passing through.

[23] *Citizen Bank v. Parnes*, 2010 WL 1753296 (6th Cir. 2010).

under subsections (1) ("the transaction of **any** business within the state"); (2) ("The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort"); (5) ("Entering into a contract for services to be rendered for the materials to be furnished in the state by defendant") and (6) ("acting as a director, manager, trustee or other officer of a corporation incorporated under the laws of, or having its principle place of business within this state.") Adelson further asserts that "there is no doubt that mailing a fraudulent assignment to Michigan with the specific intent for it to be recorded in the register of deeds with a continued intent to harm Adelson is within the realm of proximate causation of mortgage fraud in Michigan and that mortgage fraud is a tort." It is not necessary for Scott Anderson to admit or deny the mailing of the June 5, 2007 assignment **because it purports his notarized signature**, and it being recorded in Oakland County Register of Deeds constitutes his conducting business in Michigan and satisfies subsection (2) of the Michigan long-arm statute.  Therefore, the court must determine whether the exercise of personal jurisdiction would comport with due process. The contract is sufficient to satisfy due process when all of the terms of the contract were to be performed in Michigan.

Other factors also support the intentional nature of the communications between Scott Anderson and Bryan Potestivo and Michigan. The telephone conversations, postal mailings, and emails were not just general, but discussions about the ongoing transaction (*the June 5, 2007 assignment*). The calls were discussions of the fabrication of the assignment and the recording of the assignment in the Oakland County Register of Deeds.  Scott Anderson is not a random party, he appears to be highly sophisticated person with an extensive history of the exact conduct as alleged here all over the United States.  In weighing the factors listed above, it is clear that Scott Anderson purposely availed himself of acting in Michigan. In sum, viewing the facts of this case in the light most favorable to Adelson, she has presented a prima facie case that Scott Anderson's

activities in Michigan constitute purposeful availment.  Adelson has established that her cause of action does arise from Scott Anderson's contacts with Michigan. *Neogen,* 282 F.3d at 889–890. This step is satisfied because Adelson's complaint stems from wrongful foreclosure, fraudulent conduct, and breach of the contract by Scott Anderson's fabrication of the June 5, 2007 assignment, and utilizing it to claim title interest in Adelson's Property.  The activity that established purposeful availment is the same activity that gave rise to Adelson's claim. This connection satisfies the "arising from" requirement.

### A.  Inference Of Reasonableness Due Process

Although personal jurisdiction is authorized under Michigan's "long-arm" statute, this Court cannot exercise personal jurisdiction in violation of the Due Process Clause of the Fourteenth Amendment. *Neogen,* 282 F.3d at 889. Adelson must present a prima facie case that the exercise of personal jurisdiction does not offend due process. *CompuServe,* 89 F.3d at 1262. Adelson must demonstrate that Scott Anderson has adequate "minimum contacts" with Michigan such that finding personal jurisdiction will not offend "traditional notions of fair play and substantial justice." *International Shoe v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).  The Sixth Circuit has articulated the due process requirements as a three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Neogen,* 282 F.3d at 889–890 (quoting *Southern Machine Company v. Mohasco Industries, Inc.,* 401 F.2d 374, 381 (6th Cir.1968)).

The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts.[24] Although a nonresident's physical

---

[24]  *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286, 291 (1980).

presence within the territorial jurisdiction of the court is not required, the nonresident generally must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[25] This case addresses the "minimum contacts" necessary to create specific jurisdiction. The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation.'"[26] For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.

First, the relationship must arise out of contacts that the "defendant himself" creates with the forum State. *Burger King Corp. v. Rudzewicz,* 471 U. S. 462, 475 (1985). Due process limits on the State's adjudicative authority principally protect the liberty of the nonresident defendant— not the convenience of plaintiffs or third parties.[27] Second, "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.[28] Accordingly, Viewing the facts in the light most favorable to Adelson, she has met the certain minimum contacts required under the Fourteenth Amendment due process.

*United Electrical Workers I,* 960 F.2d at 1089. The court may exercise general jurisdiction "when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state."[29] Specific jurisdiction may be appropriate when the cause of action arises directly

---

[25] *International Shoe Co. v. Washington,* 326 U. S. 310, 316 (1945) *Milliken v. Meyer,* 311 U. S. 457, 463 (1940)

[26] *Keeton v. Hustler Magazine, Inc.*, 465 U. S. 770, 775 (1984) *Shaffer v. Heitner,* 433 U. S. 186, 204 (1977).

[27] See *World-Wide Volkswagen Corp., supra,* at 291–292.

[28] See, e.g., *International Shoe, supra,* at 319 (Due process "does not contemplate that a state may make binding a judgment in personam against an individual . . . with which the state has no contacts, ties, or relations"); *Hanson, supra,* at 251 ("However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him").

[29] Id. at 1088.

out of, or relates to, the defendant's contacts with the forum state.[30] Adelson's injuries would not have occurred **'but for'** Scott Anderson's activities in Michigan, and as a result of Scott Anderson's conduct in Michigan, which gave birth to Adelson's cause of action.[31] Adelson's title interest is via, Warranty Deed, and is superior to the title interest claimed by Defendants, Scott Anderson, Ocwen Loan Servicing, Ocwen Financial Corp, HSBC/ACE and MERS claim interest through a fraudulent assignment. Furthermore, independent of the inference, Adelson has alleged sufficient facts to present a prima facie case that the consequences caused by Scott Anderson have a substantial enough connection to Michigan to make the exercise of personal jurisdiction reasonable. *Neogen* echoed *International Shoe* in its emphasis that Michigan has an interest in the regular and systemic businesses that impact the state. *Neogen*, 282 F.3d at 892. This interest is compounded in the present case by Adelson's fraud and misrepresentation claims. In sum, viewing the facts in the light most favorable to Adelson, she has presented a prima facie case that Scott Anderson's meet the minimum contacts test and the exercise of personal jurisdiction will not offend due process.

The Court must determine if the acts of Scott Anderson have a substantial enough connection with the forum state to make the exercise of jurisdiction over him reasonable. *Theunissen,* 935 F.2d at 1461. As such, "only the unusual case will not meet this third criterion." *Am. Greetings Corp. v. Cohn,* 839 F.2d 1164, 1170 (6th Cir.1988). The Supreme Court, in *Asahi Metal Industries Company v. Superior Court of California, Solano County*, held that determining reasonableness of jurisdiction is best found by balancing " 'the burden on the defendant, the

---

[30] *Ticketmaster -- New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994); *United Electrical Workers I*, 960 F.2d at 1088-89.

[31] see *United Electrical Workers I*, 960 F.2d at 1089; *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994) (relatedness element satisfied ***where contract at issue arose from the defendant's in-forum activity, and that the dispute would not have occurred but for such activity***). cert, denied, 115 S. Ct, 1959 (1995).

interests of the forum state, and the plaintiff's interest in obtaining relief,' giving due regard to 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.' "480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

As to the first factor, Scott Anderson is a citizen of and resides in Florida and it is likely a substantial burden on him to defend this suit in the Eastern District of Michigan. However, concerning the second factor, Michigan, as the forum state, has a substantial interest in having issues regarding real property located in the state resolved in Michigan.  Finally, regarding the third factor, Adelson has a significant interest in retaining relief.  However, if Scott Anderson were dismissed from this action, Adelson still has claims against Ocwen, HSBC/ACE, MERS and the FDIC.   The court should find, looking to the balancing of factors and in light of the presumption of reasonableness, that exercise of jurisdiction is reasonable. Find that Scott Anderson has purposefully availed himself to Michigan, the cause of action arose from his contacts with Michigan, and exercise of jurisdiction is reasonable.

## II.   SCOTT ANDERSON UTILIZED HIS EMPLOYMENT WITH OCWEN, MERS, & HSBC TO PERPETRATE A FRAUD IN MICHIGAN

### A.   Piercing the Corporate Veil in Michigan

Under Michigan law, "where [a] corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored[32]." The corporate veil "may be pierced only when an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy."[33] "Michigan

---

[32] *Porta–John of America v. United States,* 4 F.Supp.2d 688, 700 (E.D.Mich.1998) (citation omitted).

[33] *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783, 798 (6th Cir.2007) (*Seasword v. Hilti,* 449 Mich. 542, 537 N.W.2d 221, 224 (1995)).

courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Id.* "The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensely fact-driven." *Id.*

Defendants failure to respond to the request for admissions, HSBC/ACE and Ocwen, have admitted they have no; (1) title interest; (2) wrongfully claimed default; (2) do not own or possess the note;  (3) conspired together to claim title interest which they have no entitlement to; (4) utilized knowledge of Sebring's license revocation on December 1, 2006, to claim loans without any consideration; (5) did not purchase the Sebring loan; (6) were not assigned servicing rights to the loan; (7) do not have original September 27, 2006 mortgage documents; and (8) paid no consideration. Fed. R. Civ. P. 36 (3)(6)(b) [Dkt #43-12]

It is a familiar principle that the agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort.[34] Conversion, Conspiracy and Fraud are all considered intentional torts under Michigan law.[35]  HSBC/ACE and Ocwen's admissions through their failure to respond to the request for admissions, have established the elements of the intentional torts of conversion, conspiracy, and fraud against Ocwen, HSBC/ACE and its corporate officer Scott Anderson.  Scott Anderson's acted under Ocwen, MERS and HSBC corporate entity, and clearly HSBC nor MERS had any knowledge of his actions, based upon HSBC's admissions

---

[34] *Zaino v. North Woodward Construction Company,* [355 Mich. 425, 429 (1959) ] (fraudulent representations); *Allen v. Morris Building Company,* [360 Mich. 214 (1960) ] (willful change in natural flowage of water); *Wines v. Crosby & Co.,* [169 Mich. 210, 214 (1912) ] (active promotion and sale of a compound known to be dangerous); *Bush v. Hayes,* 286 Mich. 546, 549, 282 N.W. 239 (1938) ] (conversion); *Hempfling v. Burr,* 59 Mich. 294, 295, 26 N.W. 496 (1886) ] (fraud). [*Id.*]"

[35] *Porta–John of America v. United States,* 4 F.Supp.2d 688, 700 (E.D.Mich.1998) (citation omitted); *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783, 798 (6th Cir.2007) (quoting *Seasword v. Hilti,* 449 Mich. 542, 537 N.W.2d 221, 224 (1995)).

they have no records of Adelson's or the loan, and claimed if HSBC was acting trustee over her loan, it would be on their computer record system, and it was not; MERS has also admitted to having no knowledge of Scott Anderson's actions. [Dkt #43-22]  Based upon the above, Scott Anderson utilized his employment status to commit a fraud upon Adelson and as s a result of she has unjustly suffered damages for the past 9 years that include but not limited to; her credit rating; reputation; creditability; emotional duress; sleepless nights; being forced to file bankruptcy 4 times and living in limbo; slandered the title to her home; interfered with her peaceful enjoyment of her property; and cause her constant worry her home was going to wrongfully be sold at a sheriff sale.

### B.  Piercing Delaware Limited Liability Company Veil

A limited liability company "is a relatively new entity that has emerged in recent years as an attractive vehicle to facilitate business relationships and transactions." *Elf Atochem North America, Inc v Jaffari*, 727 A.2d 286, 287 (del. 1999).  "The wording and architecture of the [Delaware] Act is somewhat complicated, but it is designed to achieve what is seemingly a simple concept – to permit persons or entities ('members') to join together in an environment of private ordering to form and operate the enterprise under an LLC agreement with tax benefits akin to a partnership and limited liability akin to the corporate form." *Jaffari,* 727 A. @d at 287.  Therefore, tor liability purposes, a limited liability company should be subject to the same treatment as a corporation. See *Wellman v Dow Chemical Co*., No. 05-280-SLR, at 2 (D. Del. March 20, 2007) ("Under Delaware law, a limited liability company formed under the Delaware Limited Liability Company Act is treated for liability purposes like a corporation").

The doctrine of piercing the corporate veil applies to Delaware corporations. "Delaware law allows a court to pierce the corporate veil of an entity when there is fraud or when a subsidiary is the alter ego of its owner."  In re *Kilroy*, 357 B.R. 411, 425 (Bankr. S.D. Texas 2006); see SR

*International Business Insurance Co. v World Trade Center Properties, LLC,* 375 F. Supp. 2d 238,

243 (S.D.N.Y. 2005), quoting *Geyer v Ingersoll Publications Co*., 621 A.2d 784, 793 (Del. Ch.

1992);

### C. Piercing the Delaware Corporate Veil

A party seeking to pierce a corporate veil [must] make a two-part showing: (i) that the

owner [or officer] exercised complete domination over the corporation with respect to the

transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured

the party seeking to pierce the veil."[36] The court stated that the plaintiffs' allegations of the

member's own tortious and fraudulent actions, including alleged Deceptive Trade Practices Act

violations, did not depend upon veil piercing **because a corporation's agent is personally liable**

**for his own fraudulent or tortious acts, even when acting within the scope of employment**.

Delaware law permits a court to pierce the corporate veil where there is fraud or where [the

corporation] is in fact a mere instrumentality or alter ego of its owner…. To prevail under the alter-

ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show

a mingling of the operations of the entity and its owner plus an overall element of injustice or

unfairness. Id.[37]  Del. Code Ann. Tit. 8, § 102(b)(6) (2009)  **A provision imposing personal**

**liability for** the debts of the corporation on its stockholders or members to a specified extent and

upon specified conditions; otherwise, the stockholders or members of a corporation shall not be

personally liable for the payment of the corporation's debts except as they **may be liable by reason**

**of their own conduct or acts;**

> "A corporate officer or director is, in general, **personally liable for all torts which he**
> **authorizes or directs or in which he participates, notwithstanding that he acted as an**
> **agent of the corporation and not on his own behalf**." The *Committee for Idaho's High*
> *Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996). Indeed, "[t]he legal fiction of the

---

[36] *Quoting Am. Fuel Corp. v. Utah Energy Dev. Co*., 122 F.3d 130, 134 (2d Cir. 1997)
[37] (quoting *NetJets Aviation, Inc. v. LHC Commc'ns LLC*, 537 F.3d 168, 177 (2d Cir. 2008)).

corporation as an independent entity was never intended to insulate officers and directors from liability for their own tortious conduct."[38] This personal liability makes logical sense—one who personally commits a tort should not be able to escape personal liability for the injury one causes simply because the actions were undertaken for the benefit of another. The organization's liability is, after all, vicarious in nature, while the individual tortfeasor's liability is direct.

The theory underlying the personal liability of officers and directors traces its roots to the much older law of agency, rather than to the law of corporations, per se. Thus, there is no need in such a situation to pierce the corporate veil, because the officer's or director's liability is independent of any of the various reasons or requirements for piercing the corporate veil.[39] Directors and officers of a corporation acting in their official capacity are considered agents of the corporation. Id. at 505;[40] But, just like any other agent, an officer, director, or shareholder "**is liable for his own acts, regardless of whether the principal is liable or amenable to judicial action.**" *Frances T.,* 42 Cal.3d at 505, quoting *James v. Marinship Corp*. 25 Cal. 2d 721, 742–43 (1944). ("One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency . . . [w]hen his acts are wrongful in their nature.")  Of course, for the officer, director, or shareholder to be liable to a third-party plaintiff, the tort must involve a breach of a duty owed to the injured plaintiff, not solely the breach of a duty owed by the tortfeasor to the corporation alone.[41]

However, personal liability may lie without any physical injury.  Courts have indicated that they would allow plaintiffs to bring these types of claims against corporate officers, directors and shareholders personally for strict liability, intentional, and negligent torts occurring within the

---

[38] *PMC, Inc. v. Kadisha,* 78 Cal. App. 4th 1368, 1380 (2d. Dist. 2000).

[39] *Frances T. v. Village Green Owners Ass'n.,* 42 Cal.3d 490, 504 (1986) (citations omitted).

[40] see also Cal. Corp. Code § 317 ("'agent' means any person who is or was a director, officer, employee or other agent of the corporation").

[41] *United States Liability Ins. Co. c. Haidinger-Hayes, Inc*., 1 Cal. 3d 586, 595 (1970) ("They are not responsible to third persons for negligence amounting merely to nonfeasance, to a breach of duty owing to the corporation alone; the act must also constitute a breach of a duty owed to the third person").

scope of their official duties. Officers, directors and shareholders **need not even directly participate in the tort**—they may be **found liable even if they only demonstrate an awareness and approval of the tortious conduct.** "A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts." *PMC, Inc.,* 78 Cal. App. 4th at 1385.  Indeed, some courts have taken it a step further, holding that **the individual defendant need not have even been actually aware of the tortious conduct, if he or she had reason to be aware of it or should have been aware of it and did nothing to stop it**. See *Schwartz,* 969 F.2d at 844 ("Tacit consent is enough to prove a conspiracy against a director or officer of a corporation, so long as the director or officer concurred in the tortious scheme with knowledge of its unlawful purpose."[42]  It is still the individual's own negligence or intentional action—in other words, the individual's responsibility to recognize and stop tortious conduct—that gives rise to his personal liability. *Frances T.*, 42 Cal.3d at 509 ("The plaintiff must also allege and prove that an ordinarily prudent person would not have acted similarly under the circumstances").

Moreover, insofar as whether Adelson must show "actual fraud" or "fraud per se," this is largely a matter of semantics under the circumstances, and underscores that the choice-of-law issue is not pivotal, given that under both Delaware and Michigan law, "fraud or similar injustice " must be demonstrated in order to pierce the corporate veil.[43] Evidence is shown that Scott Anderson fabricated a fraudulent mortgage assignment for his own personal benefit by transferring

---

[42] *PMC, Inc.,* 78 Cal. App. 4th at 1387 ("Shareholders, officers, and directors of corporations have been held personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct." (collecting cases)). *Cf. AccuImage Diagnostics Corp. v. TeraRecon, Inc*., 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003) ("mere knowledge of tortious conduct by the corporation is not enough to hold a director or officer liable for the torts of the corporation absent other 'unreasonable participation' in the unlawful conduct by the individual").

[43] See, e.g., *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F. Supp. 260, 268 (D.Del.1989) ("fraud or something like it is required" under Delaware law); *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp.2d 279, 295 (D.Del.2000) ("In order to prevail on a claim to pierce the corporate veil ... a plaintiff must prove that the corporate form causes fraud or similar injustice"); [43]

Adelson's loan to another entity controlled by him based upon an unsubstantiated loan transfer. Moreover, Ocwen could not have been servicing the loan for Sebring on December 19, 2006, because it possessed no mortgage license after December 1, 2006; and clearly Scott Anderson as controller of Ocwen kept the money paid by Adelson for himself, because one thing is for sure, it was never turned over to Sebring.

### D. Fed. R. Civ. P. Rule 9 (b)

Federal Rule of Civil Procedure 9(b) requires a plaintiff to plead common law fraud claims with particularity. In particular, Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). To satisfy this requirement, the Plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the Defendant; and the injury resulting from the fraud." *Coffey v. Foamex*, 2 F.3d 157, 161–62 (6th Cir.1993)[44] Rule 9(b) is to be read in conjunction with Rule 8(a), which requires that pleadings include "a short and plain statement of a claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a);[45] "The threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way plaintiffs [sic] claim of fraud."[46] Adelson Amended Complaint satisfies the particularity requirement of Rule 9(b) because it places the Defendants including Scott Anderson on sufficient notice of the basis for the fraud claim. In particular, it alleges including but not limited to:

> (1) claiming default when there was no default; (2) Scott Anderson fraudulently fabricated a mortgage assignment; (3) MERS agrees a deactivation of the loan number affixed to the mortgage could never be reactivated; (4) Sebring mortgage licenses being revoked on December 1, 2006 prevented it from authorizing the assignment on June 5, 2007; (5) the ACE trust had closed 6 months before the assignment; (6) the assignment contains forged

---

[44] (quoting *Ballan v. Upjohn Co*., 814 F.Supp. 1375, 1385 (W.D.Mich.1992)).
[45] see Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir.1988).
[46] Coffey, 2 F.3d at 162 (quoting Brewer v. Monsanto Corp., 644 F.Supp. 1267, 1273 (M.D.Tenn.1986)).

signatures specifically Scott Anderson; (7) MERS had not authority to effectuate the assignment between 2 non – MERS members; (8) Scott Anderson and the other defendants conspired together to claim title interest to which they are not entitled; (9) intentionally destroyed her credit fico score in order to prevent her from seeking a refinance; (10) tortuously interred with her contract with Sebring; (11) paid no consideration for its claimed title interest; (12) fabricated a promissory note; (12) altered the payment history in order to claim a default and wrongful foreclosure; (13) slandered the title to her property; (14) clouded the title to her property; (15) broke her chain-of-title to her property; (16) fraudulently conveyed the title to her property; (17) Scott Anderson, HSBC/ACE, Ocwen and MERS conspired together to wrongfully encumber her property; (18) HSBC/ACE fraudulently portray ACE is a legal entity whereas, it does not exist; (19) used unfair or unconscionable means in an attempt to collect a debt paid-in-full on December 10, 2006; (20) failed to properly account for payments; and (21) engaged in unfair, unlawful and fraudulent business practices in their attempting to illegally collect a debt they have no claim violating the deceptive trade practices act;

In light of these specific allegations, the Court should find that the Amended Complaint was pleaded with the particularity required by the Federal Rules of Civil Procedure. Indeed, the Complaint set forth: (1) the content of the misrepresentations; (2) the period of time during which those misrepresentations were made; and (3) the location where the misrepresentations were made. Thus, the Amended Complaint adequately places the all of Defendants on notice of the basis for the claim against them, thereby allowing all of the Defendants to answer the fraud claim in an informed way.

### E. **Personal Liability**

Scott Anderson seeks a dismissal of the claims asserted against Anderson in his individual capacity, asserting that there is no basis upon which to hold him individually liable for the acts of Ocwen, MERS and HSBC/ACE. A corporation is a legal entity that exists separate and apart from its officers, directors, and shareholders. Generally, shareholders, officers and directors of the corporation are not held liable for the debts or actions of this separate legal entity. The corporate veil can be pierced, however, to hold an individual corporate officer or shareholder liable for the wrongs committed by a corporation under certain circumstances. In particular, the corporate veil

can be pierced when: (1) the individual to be held liable exerted such complete control that the corporation has no separate mind, will, or existence of its own; (2) control was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) injury or unjust loss resulted to the plaintiff from such control and wrong. Id. at 1086.  However, Adelson argues that the facts alleged support a finding that Scott Anderson can be held personally liable on the claims asserted. She point out that the doctrine of piercing the corporate veil was not intended to be used as a shield to immunize all corporate officers or shareholders from personal liability for their own misdeeds. As such, the she argue that, under Michigan law, corporate officers or shareholders may be personally liable for the torts they commit in their corporate capacity.  Therefore, Adelon assert that Scott Anderson may be held liable for the torts he personally committed while acting as an agent of Ocwen, HSBC/ACE & MERS.

Adelson points out, corporate officers may be held liable for the torts they commit while acting within the scope of their employment. When a corporate officer commits a tort while in the performance of his duties, he is individually liable for the wrongful act.  Indeed, if an agent commits a tort in the course of his agency, the fact of agency will not relieve him of liability, and this is so even though the principal may be liable also.  A tort victim is entitled to recover from the agent as well as the principal for fraudulent misstatements made by the agent in the course of his employment. Thus, Scott Anderson cannot shield himself from liability for the conduct in which he allegedly engaged merely because he engaged in that conduct as a corporate officer; the fact that Adelson may not be able to pierce the corporate veil is irrelevant to the issue of Scott Anderson's personal liability for his own conduct. Adelson need not pierce the corporate veil to hold corporate officers liable for the allegedly fraudulent conduct in which they personally engaged, jurisdiction is proper, and Scott Anderson's Motion should be denied.

Respectfully submitted,

May 5, 2016

_/s Wendy Adelson_

Wendy Adelson, Pro Se,
Attorney for Plaintiff,

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on May 5, 2016, by:

☐ US MAIL     ☐ FAX     ☐ HAND DELIVERY     ☒ CM/ECF Live Database

☐ E-FILING-ODYSSEY FILE & SERVE     ☐ FEDERAL EXPRESS     ☐ EMAIL

_/s/ Wendy B. Adelson_

WENDY B. ADELSON

---